# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:10-CR-005-07** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **MIGUEL ANGEL SOLORIO** | : | |

## MEMORANDUM

Presently before the court is the motion (Doc. 290) of defendant Miguel Angel Solorio ("Solorio") to suppress evidence seized during a warrantless search of the vehicle he was operating on May 19, 2010. Solorio argues that officers lacked probable cause, or reasonable suspicion, to engage in the warrantless stop of the vehicle (see Doc. 290 ¶ 5; Doc. 292 ¶ 3), and, therefore, all evidence obtained as a result of that stop must be suppressed. The court held an evidentiary hearing on the motion on December 3, 2010,[1] after which the parties filed supplemental briefing. (See Docs. 404, 411). For the reasons that follow, the motion (Doc. 290) will be denied.

## I. Findings of Fact[2]

In the fall of 2009, the Drug Enforcement Agency ("DEA") instituted an investigation of a drug trafficking organization based in Lancaster, Pennsylvania. (Hr'g Tr. at 5). DEA agents obtained court-authorized wiretaps on several

---

[1] Citations to the December 3, 2010 hearing transcript are abbreviated throughout as "Hr'g Tr."

[2] These findings are based on evidence presented at the December 3, 2010 hearing on the motion, and they reflect this court's assessment of the credibility of the testimony provided.

telephones. (Id.) From the wiretaps, investigators identified Angel Bonilla and Ismael Bonilla, co-defendants in the above-captioned matter, as sources of supply, or individuals able to provide cocaine, for the Lancaster-based organization. (Id.) DEA agents then developed a confidential informant ("CI") to engage the Bonillas, who were themselves located in the Atlanta Georgia area, in a drug deal. (Id.) The CI negotiated with Angel Bonilla ("Bonilla") to purchase cocaine, initially to be delivered to central Pennsylvania. (Id. at 7). After difficulties developed with delivery of the drugs to Pennsylvania, the CI agreed, under DEA instruction, to travel to the Atlanta area to make the purchase.[3] (Id. at 7).

DEA Agent Phil Klemick ("Agent Klemick") and DEA Task Force Officer Mike Neff ("Officer Neff") traveled with the CI to the Atlanta area on May 18, 2010.[4] (Id.) During the investigation in Atlanta on May 18 and May 19, 2010, law enforcement agents from the DEA High Intensity Drug Task Force group assisted Agent Klemick and Officer Neff. (Id. at 8-9). Agent Klemick remained with the CI throughout the operation, while Officer Neff and other agents conducted physical

---

[3] During the events described herein, co-defendant Ismael Bonilla was incarcerated for an unrelated matter. (Hr'g Tr. at 6).

[4] Both gentlemen are experienced investigators. Agent Klemick has been a special agent with the DEA since August 1998 and has been involved in hundreds of drug investigations. (Hr'g Tr. at 4, 28). Officer Neff, currently employed as a detective for the East Lamperton Township police department, has worked as a law enforcement officer since 1997. (Id. at 31-32). He spent approximately eleven years as a detective for the county drug task force prior to his assignment to the DEA in October 2009. (Id.)

surveillance of the activities. (Id. at 23, 32-33). Agents communicated developments in the investigation by radio and cellular phone. (Id. at 9, 14).

On May 19, 2010 the CI exchanged numerous telephone calls and had one meeting with Bonilla. (Id. at 9-10). The CI met with Bonilla at a Walmart in Duluth, Georgia, close to Atlanta. (Id. at 10). Officer Neff viewed the meeting from a position inside the Walmart while Agent Klemick waited for the CI in a vehicle in the parking lot. (Id. at 10, 33). At the conclusion of the meeting the CI reported the details to Agent Klemick: the CI arranged to purchase four kilograms of cocaine from Bonilla;[5] Bonilla would pick up the drugs and the drug source, and Bonilla would provide the drugs for the CI's inspection at a nearby hotel. (Id. at 11).

Subsequent to the meeting, officers observed Bonilla leave the Walmart in a Lincoln Navigator, and continued to follow his physical movements. (Id. at 14, 33-34). Bonilla stopped at several locations, but when he left the last location—a Waffle House parking lot—a black Volkswagen Passat and a Ford Explorer traveled in tandem with him to his residence. (Id. at 33-34, 36). Agent Klemick and Officer Neff inferred that one of the cars contained the cocaine and the other contained the source of the cocaine (id. at 19, 35-36)—a common occurrence in drug deals in order to separate the source from the illegal contraband. (Id. at 19, 35-36).

---

[5] The CI discussed the purchase of five kilograms of cocaine with Bonilla, however, during the meeting Bonilla raised the per-kilogram price, thus the CI informed him he only had sufficient funds to purchase four kilograms. (Hr'g Tr. at 11-12).

3

The CI was in telephone contact with Bonilla during the period when officers were observing Bonilla's movements. (Id. at 15). At some point, Bonilla informed the CI that plans had changed. (Id. At 15-16). The source was uncomfortable with the idea of bringing the cocaine to the hotel to inspect, so Bonilla urged the CI to come to Bonilla's residence where the CI could inspect one kilogram in the residence garage, and if satisfied, the other three kilograms would be available. (Id.). Agent Klemick, who remained with the CI, was informed of the development and relayed it to the other agents. (Id. at 10, 15). At approximately 6:06 p.m. the CI telephoned Bonilla and Bonilla indicated that the person he was waiting for was right around the corner. (Id. at 17). At approximately 6:25 p.m. by way of another phone call, Bonilla informed the CI that he was ready and the CI should head towards Bonilla's residence. (Id.)

Officer Neff and Agent Robert Norton from Atlanta ("Agent Norton") were situated outside Bonilla's residence in a position to conduct surveillance. (Id. at 37, 39). Consistent with the reports relayed by Agent Klemick of the CI's phone calls with Bonilla, they observed all three vehicles arrive at the residence around 6:26p.m.. (Id. at 36-37, 54, 56). The Passat parked in a lot approximately thirty (30) yards away from the residence. (Id. 38, 68). Officer Neff and Agent Norton observed several individuals entering and exiting the garage, of which they took a partial video recording. (Id. at 37, 45). At approximately 6:43 p.m. Officer Neff observed the defendant, Solorio, walk from the direction of the Passat into Bonilla's garage. (Id. at 38-39, 55, 56). Officer Neff did not see Solorio exit the Passat as his

4

attention was focused on the garage of Bonilla's residence, however, Solorio and the other individual with Solorio were the only individuals to walk from the area of the Passat during the period of observation. (Id. at 46, 52-53, 56, 62-63,).

Officer Neff reported, and the video corroborated, that Solorio carried a black drawstring backpack with a white Armani Exchange emblem. (Id. at 39). The bag was consistent with the size and shape of a kilogram of cocaine (Id. at 41), so much so that Officer Neff and Agent Norton "joked with each other that that was the kilogram going into the garage at the time." (Id. at 41). Officers further noted that no other individuals entering and exiting the garage of the Bonilla residence carried anything.[6] (Id. at 38-39). As a result of the ongoing communication between officers in the investigation, at the time Officer Neff observed Solorio with the backpack at the garage, he was aware that the inspection of the cocaine was to occur at the garage, that the source would be present, and that only one kilogram would be available for inspection.[7] (Id. at 40-41).

Officer Neff next observed the Ford Explorer leave Bonilla's residence. (Id. at 42). Moments later, Agent Klemick relayed to Officer Neff that the inspection site had changed to the nearby Studio 6 Motel. (Id.) Two to three minutes later, Bonilla

---

[6] Officer Neff testified that in his experience he has seen individuals conceal drugs on the body (Hr'g Tr. at 47), and hide drugs outside, though never the quantity of drugs at issue in the instant matter. (Id. at 65).

[7] Officer Neff testified that "everything that Agent Klemick was relaying to us, shortly thereafter . . . we were seeing things that Agent Klemick was relaying to us." (Hr'g Tr. at 39).

5

and another individual got in the Lincoln Navigator, pulled out of the parking spot and waited for the Volkswagen Passat. (Id. at 43). The Passat followed the Navigator out of the parking lot and both headed toward the motel. (Id.). Officer Neff observed Solorio in the Passat when it left. (Id. at 47).

At this point, the DEA directed the Gwinnet County Police officers involved in the investigation to stop the two vehicles. (Id. at 44). Officer Neff was the first to arrive at the scene after the stop by the marked police cruisers. (Id.) Solorio was seated in the driver's seat of the Passat, and Officer Neff spotted the black backpack with Armani Exchange emblem between the legs of the front-seat passenger, co-defendant Jesus Mundo Diaz. (Id. at 44, 51-52). Officers searched the bag and discovered a kilogram of cocaine. (Id. at 44-45). Officers did not have a warrant to stop the vehicles or search the backpack. (Id. at 51).

## II. **Procedural History**

On July 7, 2010, the Grand Jury returned a six-count Superseding Indictment charging Solorio and thirteen others with drug-related offenses. (Doc. 69). Solorio was charged in three counts: (1) criminal conspiracy to distribute and possess with intent to distribute five kilograms and more of cocaine hydrochloride, 50 grams and more of cocaine base, 100 grams and more of heroin, and marijuana, in violation of 21 U.S.C. § 846; (2) criminal conspiracy to possess firearms in furtherance of drug trafficking, in violation of 18 U.S.C. §924(o); and (3) distribution and possession with intent to distribute five kilograms and more of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1). (Id.) Solorio pled not guilty at his initial appearance on

August 6, 2010, and was ordered detained pending trial. (Docs. 193, 202, 206). After a motion and hearing to reconsider the detention order, Solorio was released. (Docs. 232, 233, 237). Solorio filed the instant motion to suppress on October 1, 2010. (Doc. 290). The court conducted an evidentiary hearing on December 3, 2010, and the parties submitted post-hearing briefing. (Docs. 404, 411). Briefing is complete and the matter is now ripe for disposition.

### III.   Discussion

The Fourth Amendment of the United States Constitution secures "persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. Searches and seizures executed without a warrant are presumptively unreasonable unless an exception to the warrant requirement covers the search. Arizona v. Gant, --- U.S. ---, 129 S. Ct. 1710, 1716 (2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). The burden is on the government to establish by a preponderance of the evidence that the circumstances justified acting without a warrant. Vale v. Louisiana, 399 U.S. 30, 34 (1970); United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992).

In the automobile context, police need not obtain a warrant to search a vehicle if "probable cause exists to believe it contains contraband." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see also California v. Carney, 471 U.S. 386, 391 (1985) ("The mobility of automobiles, we have observed, 'creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible.'" (quoting South Dakota v. Opperman, 428 U.S. 364, 367

(1976))); United States v. Johns, 469 U.S. 478, 484 (1984) ("'[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband.'" (quoting United States v. Ross, 456 U.S. 798, 823 (1982))). Probable cause to search a vehicle exists when the totality of the circumstances reasonably indicate that evidence of criminality is contained therein. See Maryland v. Dyson, 527 U.S. 465, 467 (1999); Karnes v. Skrutski, 62 F.3d 485, 498 (3d Cir. 1995); United States v. McGlory, 968 F.2d 309, 343 (3d Cir. 1992).

In the instant matter, considering the totality of the circumstances, the court concludes that the officers had probable cause to believe that the Passat and Navigator were transporting cocaine. From the communications between the CI and Bonilla, Officer Neff and Agent Klemick knew that Bonilla was to pick up the drug source and the drugs and provide it for inspection. Officers observed Bonilla's vehicle meet up with two other vehicles at a Waffle House, after which the vehicles traveled in tandem to Bonilla's residence. At the same time, phone calls between Bonilla and the CI resulted in a change in location of the drug inspection to Bonilla's residence. Officers knew that only one kilogram would be provided for inspection at the inspection location. Coinciding with Bonilla's instructions that the CI move towards the residence for the inspection, Officer Neff observed the three vehicles arrive at Bonilla's residence. Officer Neff also observed Solorio carrying a drawstring bag on his back with a bulge matching the size and shape of a kilogram of cocaine. Officer Neff testified that, in his experience, it would be

8

unlikely for that quantity of drugs to be either strapped to an individual's person or hidden outside. Further phone calls resulted in another change of location, back to the Motel 6 for the drug inspection. Contemporaneous with this information, Officer Neff observed the Ford Explorer leave the Bonilla residence followed a few minutes later by the Navigator and the Passat, these two vehicles again in tandem and headed towards the Motel 6 location.

Given both Officer Neff and Agent Klemick's extensive history in drug investigations, they inferred that one of the vehicles contained the cocaine, because it is usual for the source of the drug to be separated from the actual drug. On the basis of the information relayed by the CI and the corroborating physical surveillance, officers had probable cause to stop the vehicle based upon a reasonable belief that it contained contraband or the proceeds thereof. The stop of the vehicle and its search were thus lawful even in the absence of a warrant.

Counsel for Solorio emphasizes that Solorio was never named by the CI and was unknown in this investigation until the day of his arrest on May 19, 2010. (Doc. 404, at 2-4). Counsel avers that there was no clear evidence to connect the Passat or Solorio to the transportation of drugs, and no reason to believe the car contained contraband. (Id. at 4-5). The court disagrees. Although Solorio was never an identified member of the DEA investigation, officers had substantial reason to suspect his involvement on May 19, 2010. He was seen coming from the area of the Passat. He entered Bonilla's garage where the informant was to inspect the drugs, he was the only individual carrying anything, and the bag was consistent with the

9

size and shape of a kilogram of cocaine.  He was seen heading back towards the Passat after exiting the garage, and Officer Neff observed him in the Passat leaving the parking lot in tandem with the Lincoln Navigator driven by Bonilla.  Taken with the known information provided by the CI regarding the inspection location and quantity of drugs to be inspected, and in conjunction with the substantial drug investigation experience of Agent Klemick and Officer Neff, who stated it is a usual occurrence for drug sources to separate themselves from the drug, by use of multiple vehicles, there was plenty to support a probable cause determination of the involvement of the Passat in transporting drugs, and Solorio's role in that activity.

Counsel for Solorio also invokes Arizona v. Gant, --- U.S. ---, 129 S. Ct. 1710, to question the search of the black bag found in the Passat.  However, Gant concerned searches in the vehicle context that occur incident to a lawful arrest.  In the instant matter, the officers had probable cause to search the vehicle itself, the search was not incident to an arrest.  Therefore, the applicable standard is the one set out in United States v. Ross, 456 U.S. 798, 820-21 (1982).  When officers have probable cause to believe a vehicle contains evidence of criminal activity, officers may search any area of the vehicle in which the evidence might be found, including all closed containers within the vehicle where the suspected contraband may be stashed.  Ross, 456 U.S. at 798; see also Carroll v. United States, 267 U.S. 132 (1925) (upholding warrantless search of vehicle stopped by officers who had probable cause to believe vehicle contained contraband); United States v. Burton, 288 F.3d 91, 100-01 (3d Cir. 2002).   In the instant matter, the black backpack falls precisely

within the range of lawful searches an officer may perform when officers have probable cause to believe a vehicle contains contraband.  As discussed above, the officers did have probable cause to search the vehicle, and thus search of the backpack for the drugs was also lawful.

**IV.     Conclusion**

For the foregoing reasons, the motion to suppress is DENIED.  An appropriate order follows.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:        January 27, 2011

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:10-CR-005-07** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **MIGUEL ANGEL SOLORIO** | : | |

## **ORDER**

AND NOW, this 27th day of January, 2011, upon consideration of defendant's motion (Doc. 290) to suppress evidence, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 290) to suppress is DENIED.

        S/ Christopher C. Conner
        CHRISTOPHER C. CONNER
        United States District Judge